UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 OCT 31 PM 4: 15

U S.
N.D. OF ALABAMA

| | |
|---|---|
| ROSE M. SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. CV-01-S-3104-S |
| | ) |
| ALABAMA POWER COMPANY, | ) |
| | ) |
| Defendant. | ) |

ENTERED

OCT 3 1 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**MEMORANDUM OPINION**

Plaintiff, Rose M. Smith, who is an African American female, alleges that her former employer, Alabama Power Company, discriminatorily failed to promote her, subjected her to a racially hostile work environment, and retaliated against her for complaining about the foregoing, all in violation of 42 U.S.C. § 1981.

The action presently is before the court on defendant's motion for summary judgment, as well as defendant's motion to strike portions of plaintiff's evidentiary submissions. Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment is due be granted. Such ruling makes it unnecessary to address defendant's motion to strike.

## I. SUMMARY OF FACTS

### A.    Plaintiff's Job Position and Duties

Alabama Power Company hired plaintiff to work as a Level 15 Chemical Technician at its Miller Steam Plant on August 3, 1987.[1]  Plaintiff was promoted[2] to Level 16 Chemical Technician II in 1992.[3]  She remained in that position until she voluntarily resigned her employment on February 19, 2001.[4]

Plaintiff's duties as a Level 16 Chemical Technician II included making dilutions, performing water analyses, operating a polisher regeneration unit, performing oil analyses as needed,

---

[1]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 24.

[2]Both parties interchangeably use the terms "promotion" and "upgrade" throughout their submissions. The court finds that the terms are functionally equivalent, and that any semantic difference in meaning or usage does not have any bearing on the outcome of this action.

[3]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 25.

[4]*Id.*, Exhibit 49 (Smith resignation letter 2/13/01).

"riffling" coal, and training co-op students.[5]  Additionally, the position required plaintiff to perform shift work, to be available for overtime, and to be on-call at night and on weekends during emergencies, or when the plant was short-handed.[6]  Plaintiff also served as a "co-systems owner" for a water treatment plant with her foreman, Anthony Wright.[7]  As such, plaintiff was required to coordinate work orders for parts and equipment needed to maintain the water treatment system.[8]

Fabert Davis became plaintiff's immediate supervisor in June of 1994.[9]  He quickly began noticing deficiencies in plaintiff's job performance.  Among other things, Davis complained that plaintiff had poor written and verbal communication skills, that she often was tardy or absent from work, and that she occasionally failed to respond to calls on her radio and pager.[10]  Plaintiff asserts that equipment problems were the reason why she often could not be reached via radio or pager, stating that, "[a]s far as the radio communication problem, I made several requests for a new radio, since that one I had was not working properly.  I was given no new radios.  Other white male employees were given new communication devises [sic], like cell phones and beepers."[11]

## B.    Plaintiff's Desired Position

Plaintiff's primary complaint is defendant's failure to promote her one grade, to the position of Level 17 Chemical Technician I, which is the top grade that can be attained by a chemical technician working at the Miller Steam Plant.[12]  Level 17 Chemical Technicians, in addition to being

---

[5]Defendant's brief in support of summary judgment, at 2.

[6]*Id.*

[7]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 40.

[8]*Id.* at 40-41.

[9]Defendant's evidentiary submissions, Tab 5 (Davis affidavit) ¶ 2.

[10]*Id.* at ¶ 5.

[11]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 5.

[12]Complaint at 1-2; Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 6.

required to perform all of the duties of a Level 16 Chemical Technician, are further charged with serving as lead technicians on projects, assuming supervisory responsibilities, performing maintenance on equipment, and, ordering parts for broken or worn out equipment.[13]   The requirements for promotion to Level 17 were set forth in a document promulgated by defendant, [14] specifying that a candidate be able to:

1.   coordinate a complex project;

2.   remain current on the development of new technology;

3.   recognize problems and take appropriate corrective action;

4.   demonstrate competency in either "results or water chemistry";

5.   be a recognized expert in water chemistry;

6.   maintain a thorough understanding of the plant's systems, and actively improve the current work processes.[15]

The promotional criteria further required that candidates for a Level 17 Chemical Technician position: demonstrate initiative in leading project assignments; promote harmony and create a positive work environment; be a recognized mentor to co-workers; develop and train others; and, demonstrate a leadership role on complex projects.[16]   The document included in defendant's evidentiary submissions is dated April 1, 1992.[17]  However, plaintiff asserts that she was not aware of the existence of this document until "February/March of 2000."[18]

---

[13]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 6.

[14]*Id.* at Exhibit C (Chem Tech Family Promotional Criteria 4/01/92).

[15]*Id.*

[16]*Id.*

[17]Defendant's evidentiary submissions, Tab 6, Exhibit C (Chem Tech Family Promotion Criteria 4/01/92).

[18]Plaintiff's brief opposing summary judgment, at 9.  Plaintiff's brief cites plaintiff's affidavit as a whole, but the only relevant portion that the court found directly contradicts plaintiff's brief.  On page 1 of the affidavit, plaintiff declares that "[a]t no time, did anyone tell me what the requirements were to be promoted to level 17." This statement is then contradicted by plaintiff's brief, which states that

-4-

The first (and apparently most important) requirement for promotion to Level 17 is the coordination of a complex project.[19]  Personnel are selected to coordinate such projects by their supervisor or other management officials who have direct knowledge of an employee's previous performance of job duties.[20]  There are only a limited number of "complex" projects undertaken by defendant each year.[21]

An employee generally is selected for promotion to Level 17 by her supervisor.  Even so, if an employee believes that she meets all of the prerequisites, she may directly request that her supervisor consider her for promotion.[22]  In either event, prior to the promotion decision the applicant is requested by her supervisor to provide documentation supporting the proffered reasons for promotion.[23]  The supervisor may also solicit information regarding the employee's qualifications from the employee's former supervisor(s).[24]

### C.   The Spring Outage Project

The "spring outage project" at the Miller Steam Plant is a "complex project."[25]  Fabert Davis, plaintiff's supervisor, selected one of her fellow Level 16 Chemical Technicians, David Williams,

---

In February/March of 2000, Mr. Peeples announced in a meeting attended by all chem-techs that from hence forth, a criteria could be used for all raises from level 16 to level 17. Plaintiff heard Mr. Peeples announce to the chem-techs present at the meeting what the criteria would be to get promoted to level 17.

Plaintiff's brief, at 9. Resolution of these contradictory statements is not necessary to adjudication of this action.

[19]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 8.

[20]*Id.* ¶ 9.

[21]*Id.*

[22]*Id.* ¶ 11.

[23]*Id.*

[24]*Id.*

[25]Defendant's brief in support of summary judgment, at 6. Defendant's evidentiary submissions, Tab 5 (Davis affidavit) ¶ 3. The record does not describe, in laymen's terms, the type of work involved in the spring outage project.

to coordinate the spring outage project in January of 1999.[26]  Williams is a Caucasian male.[27] Plaintiff was selected by her foreman, Anthony Wright, to assist Williams on the project.[28]

Davis states that he selected Williams to coordinate the spring outage project based on his experience and prior job performance.[29]  When justifying his failure to select plaintiff, Davis explained that he had assigned plaintiff to smaller projects in the past, and her performance on those projects convinced him that she lacked the necessary qualifications.[30]  Additionally, Davis explained that he sometimes had difficulty locating plaintiff when she was at work or on-call.[31]

While the spring outage project was underway, Davis was replaced by Alan Peeples as plaintiff's immediate supervisor.[32]  Peeples served as plaintiff's supervisor until she resigned her employment in February of 2001.[33]  Plaintiff also was generally supervised by the Compliance and Support Team leader at the Miller plant, John Banger.[34]

**D.    Plaintiff Was Not Promoted to Level 17 in August of 1999**

During August of 1999, Banger requested that all chemical technicians who desired to be considered for promotion to Level 17 submit information detailing their qualifications to him.[35] Banger asserts that plaintiff never provided the requested information, nor did she request that he

---

[26]Defendant's evidentiary submissions, Tab 5 (Davis affidavit) ¶¶ 3-4.

[27]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 1.

[28]Plaintiff contends that she actually was co-coordinator on the project, equal in rank and responsibility to Williams, but defendant denies that assertion.  Defendant's evidentiary submissions, Tab 5 (Davis affidavit) ¶ 4. Moreover, plaintiff does not provide any evidence that she was co-coordinator, beyond her own assertion.

[29]Defendant's evidentiary submissions, Tab 5 (Davis affidavit) ¶ 3.

[30]*Id.* ¶ 6.

[31]*Id.* ¶¶ 5-6.

[32]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 2.

[33]*Id.*

[34]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 2.

[35]*Id.* ¶ 4.

consider her for promotion to Level 17.[36]  In contrast, Williams did both.[37]  Plaintiff disputes

Banger's statements, asserting that she had " reviewed the list of accomplishments submitted by Mr.

Williams.  *I submitted a like list of accomplishments.* "[38] In support o that assertion, plaintiff

included in her evidentiary submissions a copy of an e-mail addressed to Banger and others, which

appears to be a list of accomplishments and other qualifications.[39]  Therefore, construing the

evidence in a light most favorable to plaintiff, the court finds that plaintiff did provide Banger with

the requested information, and that she provided such information for the purpose of being

considered for promotion to Level 17.

Since Banger was not present throughout Williams's tenure at the Miller plant, he also

requested that Williams's former supervisor, Fabert Davis, provide him with additional information

regarding Williams's job performance, before determining whether to promote Williams to Level

17.[40]  Davis provided Banger with the information, and recommended that Williams receive the

promotion.[41]  Banger subsequently promoted Williams to Level 17.[42]  Plaintiff discovered that

Williams had been promoted two or three weeks later.[43]

Shortly after Williams's promotion, defendant's human resources department held a "Focus

Group Meeting" at the Miller Steam Plant.[44]  Following the meeting, plaintiff complained to

---

[36]*Id.*

[37]*Id.* ¶ 5.

[38]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 4 (emphasis supplied).

[39]*Id.* at number 12 (Smith email 8/4/02). Note that plaintiff's evidentiary submissions has this document listed as number 13, but that is incorrect.

[40]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 5.

[41]*Id.*

[42]*Id.*

[43]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 47-49.

[44]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 5.

defendant's human resources representative, Phyllis Vicario, that she was not happy with Williams's promotion to Level 17.[45] Vicario informed Banger of plaintiff's concerns, and Banger requested that Peeples speak with plaintiff about these issues.[46] Peeples complied, and claims to have had a meeting with plaintiff on August 19, 1999, wherein she complained about Williams' promotion, and her own failure to be promoted, to Level 17.[47] Plaintiff, however, denies that this meeting occurred.[48]

Peeples also claims that, around this same time, he met with all of the chemical technicians, including plaintiff, to ensure that each had copies of the Level 17 promotional criteria.[49] He also requested that each technician who believed that he or she was qualified specifically address each line item of the promotional criteria.[50] Plaintiff also denies that this meeting occurred.[51] She asserts that she was not aware of the existence of written criteria for promotion to Level 17 until "February/March of 2000."[52]

### E.    Plaintiff's 1999 Performance Evaluation

Miller Steam Plant employees were evaluated once each year by their immediate supervisor and general supervisor.  The written assessment instrument was divided into three categories: individual/team results, individual behaviors, and development.[53]  Additionally, supervisors were permitted to comment generally on an employee's job performance, and each employee was

---

[45]*Id.*

[46]*Id.*

[47]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 4.

[48]Plaintiff's evidentiary submissions, number 1 (Smith affidavit), at 2.

[49]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 4.

[50]*Id.*

[51]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 2.

[52]*See supra* notes 17 and 18, and accompanying text.

[53]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 18.

afforded an opportunity to respond to the comments and ratings received.[54]

Peeples met with plaintiff to review her 1999 performance evaluation on January 31, 2000.[55] He informed plaintiff that her job performance had been adjudged deficient in several areas: namely, that she was frequently tardy; she was difficult to contact after hours when she was on-call; she was a substandard communicator (both written and oral); and, she failed to actively teach new technicians or co-op students how to do their jobs.[56]   Plaintiff's version of what occurred at this meeting is described in the brief she submitted in opposition to summary judgment:

> In January of 2000, Mr. Peeples gave plaintiff her first poor performance report ever. (Plaintiff's affidavit, plaintiff's exhibit 3). He never said a word to her about this being a cause or reason for not being promoted to level 17. (Plaintiff's affidavit). The only thing that Mr. Peeples told the plaintiff was that she needed to do a special project to get up to level 17. He did not say that she had to improve her performance in regards [sic] to her promotion. That never entered the conversation. (Plaintiff's affidavit). Plaintiff's last evaluation had been in May of 1999 and it had been a good one. (Plaintiff's exhibit 3).[57]

During deposition, plaintiff described her meeting with Peeples as follows:

> When I had an evaluation in January 2000, it was written on my evaluation that I was denied — I asked them about it, why he had failed to respond to my request, why I got no answers. And he responded on my January 2000 evaluation that he was not going to recommend me for an upgrade to Level 17. After that, I think, it was a couple of weeks later, I notified Alabama Power's Internal Affairs, and I proceeded to file an internal complaint.[58]

Peeples claims that, during this meeting, plaintiff did not request that she be reconsidered for promotion to Level 17, and that she did not, at that time, reassert her prior complaint regarding her denial of promotion to Level 17.[59]

---

[54]*Id.* at Exhibit A.

[55]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 5.

[56]*Id.* at Exhibit A.

[57]Plaintiff's brief opposing summary judgment, at 8.

[58]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 52.

[59]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 5.

**F.      Plaintiff's Complaint of Harassment**

On February 7, 2000, plaintiff complained to defendant's Ethics and Business Practices Department that she had been harassed and retaliated against by Peeples when he gave her a negative performance evaluation, and did not recommend her for promotion to Level 17.[60]  In her complaint, plaintiff stated that Peeples harassed her about tardiness and absenteeism, even though she had submitted medical documentation, explaining that she suffered from migraine headaches.[61]

Defendant's Ethics and Business Practices consultant, Brendia McCray, conducted an investigation.[62]  McCray reported that she was unable to substantiate plaintiff's allegations.[63] Nonetheless, McCray met with Banger and Peeples and advised them how to avoid future conflicts with plaintiff.[64]  Specifically, McCrary recommended that: Peeples make semantical revisions to plaintiff's 1999 performance evaluation; plaintiff be assigned a major project to coordinate; and management obtain medical releases from plaintiff for the purposes of contacting her physicians and determining whether any substances at the Miller plant were causing or exacerbating plaintiff's migraines.[65]

**G.      Plaintiff is Assigned a Major Project to Coordinate**

Pursuant to McCray's recommendation, Peeples met with plaintiff on September 15, 2000, and assigned her to coordinate the next major project on the calendar — the fall outage project.[66] During the meeting, Peeples briefed plaintiff as to his expectations regarding the project, as well as

---

[60]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 52-53; Defendant's evidentiary submissions, Tab 7 (McCray affidavit) ¶ 3.

[61]Defendant's evidentiary submissions, Tab 7 (McCray affidavit) ¶ 3.

[62]*Id.* ¶ 4.

[63]*Id.* ¶ 5.

[64]*Id.*

[65]*Id.*

[66]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 12.

the deadlines by which certain tasks must be completed.[67]  Peeples also discussed plaintiff's first period 2000 performance review.[68]  Peeples emphasized his concerns with plaintiff's failure to answer her radio and/or pager, as well as her continued tardiness.[69]  He explained to plaintiff that, since she had no current medical restrictions, her tardiness would not be tolerated and, further, that since her medical condition was currently under evaluation, she would be required to submit a written doctor's excuse to authenticate any absences attributed to illness.  Peeples also warned plaintiff that, if she did not improve her job performance, she could face disciplinary action.[70]

Peeples and plaintiff met again on September 25, 2000, to discuss the project.[71]  During this meeting, Peeples gave plaintiff various instructions, including a mandate that she ensure that all work orders for the project were submitted to him no later than September 29, 2000.[72]  Plaintiff asserts that, while she was in charge of the project, she "filed all reports on time and finished all the tasks required."[73]

## H.   Plaintiff's Medical Restrictions

Pursuant to McCray's suggestion, defendant obtained medical releases from plaintiff on June 3, 2000, for the purpose of evaluating the relationship (if any) between plaintiff's medical condition and environmental conditions within the Miller Steam Plant.[74]  Plaintiff consistently had been tardy for work and excessively absent since 1998.[75]  Plaintiff attributed her tardiness to migraine

---

[67]*Id.*

[68]*Id.*

[69]*Id.*

[70]*Id.*

[71]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 13.

[72]*Id.*

[73]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 5.

[74]Defendant's evidentiary submissions, Tab 1, Exhibits 14 and 16.

[75]Defendant's brief in support of summary judgment, at 13.

headaches and a sinus condition, which she claims were exacerbated by the chemicals and coal that she worked around at the Miller plant.[76]

Defendant's Disability Management Department informed Peeples on August 14, 2000 that, after reviewing plaintiff's medical records and interviewing her treating physicians, defendant's medical director, Dr. Terrell Spencer, had determined that no medical restrictions were necessary in order for plaintiff to perform her job.[77] However, Dr. Spencer did recommend that plaintiff wear a respirator when around potentially aggravating substances, such as coal dust.[78] Peeples and Banger then met with plaintiff on August 16, 2000, to inform her of Dr. Spencer's findings, as well as to once again admonish her to arrive at work on time.[79]

Dr. Spencer's findings and recommendations notwithstanding, plaintiff continued to complain that she could not satisfactorily complete her duties, because the conditions in the plant aggravated her migraines and sinuses. Dr. Spencer received letters from two of plaintiff's personal physicians, stating that plaintiff desired to be placed in a less irritating job setting.[80] The first letter reported that "[plaintiff] tells me that [her headaches] can be aggravated by strong odors due to chemicals, loud noises, and hot and cold temperatures. She would like this type of activity limited if possible in her working environment so her headaches will not bother her as much."[81] The second letter indicated that coal dust could be an irritant, and that "[h]opefully a place can be found for Ms. Smith so a trial for several weeks can be made to see if she has the same difficulties in a different

---

[76]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 7.

[77]*Id.* ¶ 6; Tab 1 (Smith deposition) at Exhibit #35 (Nalley letter 11/15/00).

[78]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 6.

[79]*Id.* ¶ 7.

[80]Defendant's evidentiary submissions, Tab 1, Exhibits 26 and 30.

[81]*Id.* at Exhibit 26.

environment."[82]

In response, Dr. Spencer ordered on October 31, 2000 that, for a period of two months, plaintiff not work in an environment where she would be exposed to fumes, vapors, coal dust, loud noises, temperature extremes, or bright lights.[83]   Dr. Spencer further stated that the medical department would re-evaluate plaintiff's restrictions at the conclusion of the two-month period.[84]

## I.   Defendant Determines that Plaintiff Must Be Removed from the Fall Outage Project

Peeples learned of Dr. Spencer's medical restrictions on the same day.[85]  He determined that plaintiff had to be removed as coordinator of the fall outage project, because she could not perform the job consistent with her medical restrictions.[86]  Plaintiff disputes Peeples' opinion, stating that "I could have finished the project with accommodations to my medical condition.[87]   In any event, Peeples and chemical technician Harold Galloway took over the project and completed the remaining work.[88]

## J.   Plaintiff is Informed of the Medical Restrictions and Her Removal from the Project

Peeples, Banger, Nalley, and defendant's human resources representative at the Miller plant (Jacqueline Whatley) met with plaintiff on October 31, 2000, and informed her of the medical restrictions that Dr. Spencer had issued.[89]  Plaintiff was further informed that these restrictions not only prevented her from continuing to function as coordinator of the fall outage project, but that they

---

[82]*Id.* at Exhibit 30.

[83]Defendant's evidentiary submissions, Tab 8 (Nalley affidavit) ¶ 7.

[84]*Id.*

[85]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 15.

[86]*Id.* It is unclear whether Peeples interpreted the medical restrictions and made the determination to remove plaintiff from the project himself, or whether plaintiff's removal was part of his instructions.

[87]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 5.

[88]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 15.

[89]Defendant's evidentiary submissions, Tab 8 (Nalley affidavit) ¶ 8.

-13-

also impacted her ability to perform the essential functions of a chemical technician.[90] Banger requested that plaintiff provide him with recommendations as to how she could be accommodated.[91] Plaintiff was then informed that she would be sent home that day, with pay, and that she would remain on leave until defendant had the opportunity to formulate a way for her to work in compliance with her medical restrictions.[92] Banger additionally informed plaintiff that she would be allowed to use the computer in the security guard's office to review and bid on jobs posted on defendant's computer network.[93]

Plaintiff protested being placed on medical leave, and insisted there were jobs at the Miller plant that she could perform consistent with her medical restrictions.[94] She further informed Banger and Peeples that she would not take any time off, and that she intended to continue to work her regular shift.[95] Banger reiterated to plaintiff that she could not return to work until defendant had identified jobs at Miller that she could perform, consistent with her medical restrictions.[96]

Plaintiff violated Banger's instructions and reported for work on November 1, 2001.[97] Banger and Nalley promptly met with plaintiff and, once again, told her that she would not be

---

[90]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 8.

[91]*Id.*

[92]*Id.* More specifically, Banger states that:

Smith was informed that her leave time would be coded to Family Medical Act Leave [sic] ("FMLA") Sick Leave, then FMLA Vacation until her paid leave was exhausted. Smith was also informed that after her paid leave was exhausted, her time would then be coded FMLA Dock if [Defendant] had not yet located duties at Plant Miller which she could perform consistent with her medical restrictions.

*Id.*

[93]*Id.*

[94]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 9.

[95]*Id.*

[96]*Id.*

[97]*Id.* ¶ 10.

permitted on the premises to perform any task, except to use the security guard's computer to review job postings.[98]  In response, plaintiff gave Banger a letter, stating that she had no intention of taking leave and, further, that she would report to work, regardless of any medical restrictions or orders otherwise.[99]  Plaintiff attached to the letter a list of duties which she believed were not violative of her medical restrictions.[100]  Nalley provided the list to Peeples and sought his feedback on the proposed tasks, as well as any other tasks which he believed that plaintiff could perform.[101]

Plaintiff also submitted to Peeples her "final report" on the fall outage project, which detailed the work she asserts that she had completed.[102]  (Peeples contends that this report is deficient because plaintiff did not finish the project and did not satisfactorily complete all of the tasks required.[103])

## K.    Plaintiff Lodges a Complaint with Defendant's President

That same day, November 1, 2000, plaintiff mailed a letter to defendant's president, Elmer Harris, complaining of discrimination.[104]  Plaintiff alleged that Banger and Peeples retaliated against her for complaints lodged with defendant's "Employee Concerns" department.[105]  Plaintiff added that she was not satisfied with the way that defendant was handling her medical restrictions.[106]  Defendant's vice president, Jerry Stewart, responded to plaintiff's letter on behalf of Harris on

---

[98]*Id.*

[99]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 10.

[100]*Id.*

[101]Defendant's evidentiary submissions, Tab 8 (Nalley affidavit) ¶ 10.

[102]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 15

[103]*Id.*

[104]Defendant's evidentiary submissions, Tab 1, Exhibit 53 (Plaintiff's letter to defendant's president, Elmer Harris).  The letter that is referenced here is dated March 7, 2001, and is authored by plaintiff.  The letter refers to the November 1, 2001 letter, as well as its contents.  Apparently, the parties did not provide the court with an original copy of the November 1, 2001 letter.

[105]*Id.*

[106]*Id.*

November 15, 2000, and promised to investigate plaintiff's allegations.[107]  Stewart also requested that plaintiff meet with him after the investigation had been concluded.[108]  Plaintiff, Stewart, and Nalley met on November 28, 2000, and plaintiff was informed that Stewart's investigation uncovered insufficient evidence to substantiate any of her claims.[109]  *Nevertheless, in an effort to resolve plaintiff's concerns, Stewart offered to promote plaintiff to Level 17, retroactively effective to August 19, 1999, the date on which plaintiff alleged that she was denied (and David Williams was awarded) the upgrade, along with back pay, among other accommodations.*[110]  Plaintiff was given until January 2, 2001 to inform Stewart whether she would accept his offer.[111]  Inexplicably, there is no evidence that she ever did so.

## L.    Defendant's Accommodation of Plaintiff's Medical Conditions

Peeples completed his evaluation of possible accommodations for plaintiff's medical conditions on November 15, 2000 — the same day that Stewart responded to the letter plaintiff had mailed to defendant's president, Elmer Harris.[112]  He requested that plaintiff report to the Miller plant on November 20, 2000, to review the proposed accommodations.[113]  Plaintiff accepted Peeples' proposal and resumed work that same day.[114]  She remained at this position until her resignation.[115]

## M.    Plaintiff's Continued Performance Deficiencies

On January 4, 2001, Ed Vernon and John Banger observed what they perceived to be

---

[107]Defendant's evidentiary submissions, Tab 1, Exhibit 33 (Jerry Stewart's letter to plaintiff).
[108]*Id.*
[109]Defendant's evidentiary submissions, Tab 8 (Nalley affidavit) ¶ 11.
[110]*Id.*
[111]*Id.*
[112]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 22.
[113]*Id.*
[114]*Id.*
[115]*Id.*

plaintiff sleeping on the job.[116]   Shortly thereafter, Banger counseled plaintiff that she should not give anyone the impression that she was sleeping on the job.[117]   Plaintiff denied that she was sleeping, but added that her medication sometimes made her drowsy.[118]   Plaintiff was not formally disciplined for this incident.[119]

On January 9, 2001, Peeples and Banger met with plaintiff to question her regarding her peculiar pattern of absences since the new year.[120]   Specifically, plaintiff was absent on January 2 and Monday, January 8 — both being the next work day immediately following The New Year's Day holiday and the weekend, respectively.[121]   The implication here is that plaintiff was dishonestly extending her weekend by feigning illness.  Despite this meeting, plaintiff again raised eyebrows by leaving work early on Friday, January 12, 2001.[122]   Being doubtful as to whether plaintiff was truly sick, Banger and Peeples required that plaintiff submit a doctor's excuse to authenticate any future absences, with Peeples stating that "[i]t is because of this unacceptable pattern [of] absenteeism that you are being required to continue to bring a Doctor's return to work slip when you are out due to sickness."[123]

**N.**     **Plaintiff Claims that Peeples Vandalized her Vehicle**

On January 22, 2001, plaintiff sent Peeples an e-mail regarding their January 9, 2001

---

[116]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 12.

[117]*Id.*

[118]*Id.*

[119]*Id.*

[120]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 13.

[121]Defendant's evidentiary submissions, Tab 1, Exhibit 40 (Peeples memo 1/17/01).

[122]*Id.*

[123]*Id.*

meeting.[124]  In the e-mail, plaintiff accused "someone" of tampering with her vehicle.[125]  Peeples

reported the e-mail to Banger, who in turn contacted defendant's corporate security office.[126]  In her

deposition, plaintiff explained that the vandal would sometimes let the air out of her tires, or

puncture the tires with screws.[127]

Banger met with plaintiff on January 24, 2001, and told her that corporate security was

investigating her vandalism claim.[128]  He asked her to identify the person who had vandalized her

automobile, but she refused.[129]

Corporate security interviewed plaintiff on February 1, 2001,[130] and plaintiff stated that, in

her opinion, Peeples was the person who had vandalized her car.[131]  She surmised that Peeples had

defaced her car in retaliation for the complaint she had filed against him.[132]  Plaintiff attested that

the vandalism to her vehicle began in August of 1999, and continued through January of 2001.[133]

Corporate security also interviewed Banger and Peeples, both of whom denied vandalizing

plaintiff's vehicle.[134]  Defendant's internal investigation found no evidence to substantiate plaintiff's

claim that Peeples had vandalized her car.[135]  In any event, plaintiff apparently does not rely upon

the incidents of vandalism as the basis for any of her claims against defendant, because she does not

---

[124]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 14.

[125]*Id.*

[126]*Id.*

[127]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 117-18.

[128]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 14.

[129]*Id.*

[130]Defendant's evidentiary submissions, Tab 1, Exhibit 42 (Plaintiff's statement 2/1/01).

[131]*Id.*

[132]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 117-18.

[133]*Id.* at Exhibit 42.

[134]Defendant's brief in support of summary judgment, at 20.

[135]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 14.

-18-

mention the vandalism in either her complaint or her brief.

**O.     Plaintiff is Accused of Falsifying a Doctor's Excuse**

Banger met with plaintiff on February 8, 2001, and demanded that she provide original copies of the doctor's excuses submitted in validation of her absences on Friday, February 2, and Monday, February 5, 2001.[136]  Plaintiff previously had submitted *copies* of those excuses, but defendant's disability management department believed the documents were forged.[137]  Banger consequently demanded that plaintiff produce the originals.[138]  Plaintiff eventually delivered a handwritten letter to Banger, stating that she would no longer provide doctor's excuses for any days that she was absent from work.[139]  The letter further stated that plaintiff was retracting the medical releases that she previously had given to defendant.[140]

**P.     Plaintiff Resigns**

Plaintiff telephoned the Miller plant on February 12, 2001, and informed an employee that she was sick, and would be absent the remainder of the week on vacation.[141]  On February 15, 2001, defendant's human resources department received plaintiff's letter of resignation, dated February 13, 2001.[142]  In the letter, plaintiff stated that her resignation was "effective Feb. 19- 2001 [sic] through March 09, 2001," and explained that "I cannot continue working in an environment that is both threatening and dangerous due to the tampering of my personal vehicle."[143]  Plaintiff then sent

---

[136]*Id.* ¶ 15.

[137]*Id.*

[138]*Id.*

[139]*Id.*

[140]*Id.*

[141]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 16.

[142]Defendant's evidentiary submissions, Tab 1, Exhibit 49 (Smith resignation letter 2/13/01).

[143]*Id.*

a letter to Banger on February 17, 2001, informing him that she had resigned, and that she would be taking the remainder of her vacation through March 9, 2001.[144] On February 19, 2001, Banger responded to plaintiff's letter, accepting her resignation, but explaining that her accumulated vacation leave would be exhausted on March 1, 2001.[145] Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC")[146] on August 22, 2001, and commenced this lawsuit on December 5, 2001.[147]

## II. DISCUSSION

A.     **Race Discrimination — Denial of Promotion**

1.     **Timeliness of plaintiff's claim**

Even though there are no administrative prerequisites to the commencement of an action or claim based upon § 1981, a plaintiff still must file suit within the applicable statute of limitations. Unlike Title VII, however, § 1981 does not contain an express statute of limitations. As a result, the Supreme Court instructs district courts to "select the most appropriate or analogous state statute of limitations" from the state in which the allegedly discriminatory act occurred. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660-61, 107 S. Ct. 2617, 2620, 2621, 96 L. Ed. 2d 572 (1987); *see also Wilson v. Garcia*, 471 U.S. 261, 266-68, 105 S. Ct. 1938, 1941-43, 85 L. Ed. 2d 254 (1985).  In Alabama, that limitations period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (holding that § 1981 intentional discrimination claims arising out of acts occurring in Alabama are governed by Alabama Code § 6-2-38(l) (1975), the state's general, two-year limitations period applicable to personal injury actions); *see also Goodman*, 482 U.S. at 661-64,

---

[144]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 16.

[145]*Id.*

[146]Defendant's evidentiary submissions, Tab 1, Exhibit 4 (Smith's EEOC charge).

[147]Complaint.

107 S. Ct. at 2620-22 (holding that the court of appeals correctly applied Pennsylvania's two year statute of limitations for personal injury actions to § 1981 claims).

"Federal law determines when a federal civil rights action accrues. The general federal rule is that 'the statute [of limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996) (quoting *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987)); *see also, e.g., Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1390 (11th Cir. 1982) ("The limitations period for § 1981 employment discrimination cases 'commences when the plaintiff knows or reasonably should know that the discriminatory act has occurred, the same point from which the Title VII 180-day limitations period runs.'") (quoting *McWilliams v. Escambia County School Board*, 658 F.2d 326, 330 (5th Cir., Unit B 1981)[148]); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) (holding that a plaintiff's § 1981 racially hostile work environment claim was governed by Georgia's two-year statute of limitations for personal injury actions, and that the statute began to run "when the plaintiff-employee knew or reasonably should have known that the discriminatory act occurred").

Plaintiff filed suit on December 5, 2001. Defendant therefore argues that plaintiff's § 1981 claim is time-barred, because her statutory time period began to run on or about August 19, 1999, when David Williams was promoted to Level 17.[149] In response, plaintiff says that her statutory period did not begin to run until January 31, 2000, the date on which Peeples presented her 1999 performance evaluation, and explained why she was not eligible for promotion to Level 17. Plaintiff

---

[148]In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the Unit B panel of the former Fifth Circuit handed down after September 30, 1981. *McWilliams v. Escambia Co. School Bd.*, was such a decision, being decided on Oct. 5, 1981.

[149]Defendant's evidentiary submissions, Tab 8 (Nalley affidavit) ¶ 11.

posits that, until that date, she believed that she was still under consideration for promotion.

Defendant asserts that plaintiff's deposition testimony establishes that she knew, or reasonably should have known, that the alleged discriminatory acts of which she complains (Williams's promotion to Level 17, coupled with her non-promotion) occurred in August of 1999 and, thus, the limitations period on her claim began to run at that time.  Defendant points to the following excerpts:

Q:      Let me ask you some questions about the 1999 application.  Was this a job posted on Job Net?

A:      Yes, it was.

Q:      For an upgrade to a Chem Tech 1 17?

A:      Uh-huh.

Q:      Is that a yes?

A:      Yes, yes.

Q:      The same position that you are claiming that you were denied to —

A:      Correct.[150]

. . . .

Q:      Do you know if anybody else was interviewed for the position?

A:      I had no knowledge of it until they actually hired somebody that transferred from another plant.

Q:      And who got hired for that position?

A:      Let me see.  Let me think of his name.  I can see his face.  I will have to come back to that one.  I can't think of his name right now.

. . . .

---

[150]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 42.

Q:      . . . What was this individual's race?

A:      White male.[151]

. . . .

Q:      And this is an e-mail from you to John Banger and Alan Peeples, correct?

A:      Yes, it was.

Q:      And this is where you attached some additional information to your application for Chem Tech 1, correct?

A:      Yes.

Q:      And the date on here is August 4th, 1999, so would you agree with me you obviously applied for it prior to that time?

A:      This was the time when I applied for it.  The job was open.  It was posted sometime within the two-week period that I applied — that I wrote this memo.[152]

. . . .

Q:      Right.  And do you recall when the job was filled, approximate time after this August 4th e-mail?

A:      *Usually they fill them within two to three weeks afterwards.*

Q:      Do you recall anything being different about this particular position?

A:      No.

Q:      *So your best estimate*, I know it is your estimate, *is that the job was filled probably two or three weeks after this e-mail went out, correct?*

A:      *Correct.*

Q:      And how did you learn that this other individual was selected for the Chem Tech position in 1999?

---

[151]*Id.* at 44.

[152]*Id.* at 45-46.

A:      I learned it when he showed up for work.[153]

. . . .

Q:      *At the time you learned that you didn't get this position, did you believe you had been discriminated against because of your race?*

A:      *Yes, I did.*

Q:      *And you believed that you had been denied the Chem Tech I position because you are African-American?*

A:      *Yes, I did.*  Because I got no response from either.  I left phone messages also on John Banger's voice mail.  An I also sent a short memo to Alan [Peeples, presumably] about this as to why — was I considered or what . . . .[154]

. . . .

Q:      *So at the time, you thought [*"*]I didn't get this job because I'm black[*"*]?*

A:      *Correct.*  Because I got no response whatsoever.

Q:      *Did you know that race discrimination was illegal at this time when you were denied a Chem Tech 1 position in 1999?*

A:      *Yes, I did.  I had known it for years.*[155]

. . . .

Q:      In June or July 1999 [sic] *when David Williams got upgraded to a Level 17,*[156] *did you believe at that time you had been discriminated against because of your race?*

A:      *Yes, I did, because I requested one also.*[157]

Shortly after the foregoing testimony, the parties took a break.  Upon returning from their

---

[153]*Id.* at 47 (emphasis supplied).

[154]*Id.* at 48. (emphasis supplied).

[155]*Id.* at 49 (emphasis supplied).

[156]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 5.  The record reflects that Williams was actually promoted to Level 17 on August 19, 1999.

[157]Defendant's evidentiary submissions, Tab 1 (Smith deposition) at 69 (emphasis supplied).

break, plaintiff set forth testimony which attempted to qualify her earlier statements:

> Q:    . . . [B]ased on your testimony here today my understanding is that when you were actually denied the position was around June 1999, correct?
>
> A:    No, that's not correct.
>
> Q:    Okay, what is correct, then?
>
> A:    I was denied in January 2000, as I've previously stated, during an evaluation in January 2000. He specifically stated I'm not going to recommend that you get the upgrade. And he also put it in writing on my evaluation. At that point that's when I took the action.
>
> Q:    Right. And I understand that happened, the evaluation happened in January of 2000, but we've been talking previously about —
>
> A:    No, it didn't start — it wasn't 1999.
>
> Q:    Okay. But just so I'm clear here, you testified previously that you felt like you had been discriminated against because of your race in 1999, correct?
>
> A:    The upgrade issue didn't occur until 2000. The only reason I mentioned 1999, the only reason that I'm even talking about it is because that was one of the projects in 1999. And Alan [Peeples, presumably] had just arrived in our department . . . .[158]

Defendant emphasizes in brief that plaintiff made this shift in perspective after conferring with her lawyer, implying that plaintiff was directed by her lawyer to recast her story in a light that would place her § 1981 race discrimination claim within the applicable statute of limitations. (Plaintiff also later submitted an affidavit, which similarly attempts to explain her earlier deposition testimony.[159])

Explanations aside, the issue here simply is when plaintiff knew, or should have known, that she had been discriminatorily denied a promotion. Plaintiff's deposition testimony clearly

---

[158]*Id.* at 76-77.

[159]*See generally* plaintiff's evidentiary submissions, Number 1 (Smith affidavit).

establishes that she formed such an opinion in the fall of 1999. Plaintiff's later deposition testimony and affidavit does nothing to controvert her previous statements, given in response to unambiguous questions, in which plaintiff clearly testified that she believed David Williams had been awarded (and she had been denied) a promotion because of race, and that she then knew such was unlawful. *See, e.g., Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (holding that a party could not create a factual issue by filing an affidavit, after defendant's motion for summary judgment, which contradicted earlier deposition testimony). The later reaffirmation of defendant's intent to refrain from promoting plaintiff does not serve to extend the statutory period. *See, e.g., Burnam v. Amoco Container Co.,* 755 F.2d 893, 894 (11th Cir. 1985) (holding that a failure to rehire subsequent to an allegedly discriminatory firing, absent a new and discrete act of discrimination in the refusal to rehire itself, cannot resurrect the old discriminatory act). Therefore, plaintiff's failure-to-promote claim is due to be dismissed as untimely.

**B.      Hostile Work Environment**

Plaintiff also sets forth a claim, under the heading of "Terms and Conditions of Employment,"[160] which this court interprets as an attempt to assert that she was subjected to a racially hostile work environment.

The elements of a racially hostile work environment claim are the same, regardless of whether it is viewed through the lens of Title VII or § 1981. The Eleventh Circuit has determined that § 1981, as amended by the Civil Rights Act of 1991, encompasses claims for a racially hostile work environment, and applies the same standards to such claims as it applies to claims based upon Title VII. *See, e.g., Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1008 n.17 (11th Cir.

---

[160]Complaint ¶ 5.

1997); *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1186 (N.D. Ala. 1999). This is but an extension of the general principle that "the legal elements of a disparate treatment claim are identical under [both] Title VII and § 1981." *Vance v. Southern Bell Telephone and Telegraph Company*, 863 F.2d 1503, 1509 n.3 (11th Cir. 1989) (citing *Lincoln v. Board of Regents of Univ. Sys.*, 697 F.2d 928, 935 n. 6 (11th Cir. 1983)); *see also Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir. 1986) (observing that a discriminatory and hostile work environment would establish a successful case under §§ 1981 and 1983, and holding that, "when these statutes are used as parallel causes of action with Title VII, they require the same proof to show liability").

As best this court can ascertain,[161] plaintiff relies upon the following incidents as the basis for her racially hostile work environment claim:

(1)     Plaintiff stated she was out of the "loop" during Peeples' tenure as supervisor.[162] (Peeples became plaintiff's supervisor during the summer of 1999.[163])

(2)     Peeples ignored plaintiff's "requests for an update [presumably referring to her promotion]."[164]

(3)     Peeples "made fun of her race," and "laughed while others made fun of her race."[165] Specifically, plaintiff states that Peeples referred to plaintiff as "you people" on some unspecified occasion, and told plaintiff that "you people don't want to work."[166] Plaintiff further alleges that Williams stated that "black people are late all the time," and that "Mr. Williams did refer to black people as not being as smart as white people." Plaintiff claims that Peeples laughed when Williams made these statements. Plaintiff does not specify when these comments were made.[167]

---

[161]*See* plaintiff's evidentiary submissions, Number 1 (Smith affidavit). This court hand-numbered the pages, for ease of reference. The court found it particularly difficult to determine with any specificity the factual basis for plaintiff's claims because her brief either does not cite the record to support her statements of fact, or gives only a blanket citation to "Plaintiff's affidavit," which consists of six, un-numbered, single-spaced, pages.

[162]*Id.* at 3.

[163]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 2.

[164]Plaintiff's brief opposing summary judgment, at 27.

[165]Plaintiff's brief opposing summary judgment, at 27.

[166]*Id.* at 24.

[167]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 6.

(4)    Peeples "refused to give [plaintiff] a promotion, the same way Williams got his."[168]

(5)    Peeples "changed the rules on [plaintiff] [presumably referring to the prerequisites for promotion]."[169]  Plaintiff claims to have learned of these "new rules" in February of 2000.[170]

(6)    Peeples "wouldn't give her a project, until forced to do so [pursuant to McCray's recommendations]."[171]  Plaintiff was given a project in September of 2000.[172]

(7)    Peeples "took her off the [fall outage] project when she wanted to stay on"[173] after plaintiff was determined to be medically unfit to work on the fall outage project.  Plaintiff was removed from the project on October 31, 2000.[174]

## 1.    Timeliness of claim

Defendant first argues that plaintiff's hostile work environment claim is time-barred, because many of the incidents of which plaintiff complains occurred more than two years prior to commencement of suit.  Some of the events occurred within the two-year statutory filing period, however, and the claim therefore is timely.

> [A] hostile work environment claim should be reviewed in its entirety, so long as one of the events comprising it fell within the statute of limitations.  Specifically, [as] the [Supreme] Court [recently] emphasized:
>
>> A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice."  42 U.S.C. § 2000e-5(e)(1)....  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.
>
> [*National Railroad Passenger Corp. v. Morgan*, ___ U.S. ___, 122 S.Ct. 2061, 2074,

---

[168]Plaintiff's brief opposing summary judgment, at 27.

[169]Plaintiff's brief opposing summary judgment, at 27.

[170]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 4.

[171]Plaintiff's brief opposing summary judgment, at 27.

[172]*Id.* at 5.

[173]Plaintiff's brief opposing summary judgment, at 27.

[174]Defendant's evidentiary submissions, Tab 6 (Peeples affidavit) ¶ 15.

153 L.Ed.2d 106 (2002).]  In making this ruling, the Court essentially rejected the "continuing violation doctrine" and simplified the law by allowing courts to view allegations of hostile work environment as "a single unlawful employment practice." *Id.* at 2075.  Put simply, if the smallest portion of that "practice" occurred within the limitations time period, then the court should consider it as a whole.

*Shields v. Fort James Corp.*, 305 F.3d 1280, 1281-82 (11th Cir. 2002).  Accordingly, the court will consider all of the events that plaintiff complains of when evaluating her hostile work environment claim.

### 2.    Prima facie case

A racially-hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).  In order to establish a prima facie case of a racially-hostile work environment, plaintiff must show that:  (1) she belongs to a class of persons protected by § 1981; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible either under a theory of direct or vicarious liability. *Miller*, 277 F.3d at 1275.

Plaintiff, as an African American female, clearly is within the protective ambit of § 1981. Further, the court finds that the acts of which plaintiff complains were subjectively unwelcome.  The remaining elements of a prima facie case require closer scrutiny, however.

The court first notes that plaintiff's descriptions of many of the incidents she complains of

are vague, and can be linked to her race only by inference.  For example, plaintiff's assertion that "she was left out of the loop once Mr. Peeples got there"[175] gives little insight into the substance of her claim.  It certainly does not establish that she was excluded because of her race, as opposed to some other, non-discriminatory reason.  Further, plaintiff complains of Peeples's usage of the phrase "you people."  Courts have repeatedly held that the utterance "you people," or some variant thereof, even when directed at African American employees, is not "inherently racially offensive . . . without greater specificity as to the context of [its] usage."  *Woodcock v. Montefiore Medical Center*, 2002 WL 403601, *6 (E.D. N.Y. Jan. 28, 2002) (quoting *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997)); *see also Lawton v. Sunoco, Inc.*, 2002 WL 1635190, *5 (E.D. Pa. July 17, 2002) (holding that use of the phrase  "you people" when addressing employees did not evidence racial discrimination against blacks); *Miller v. CCC Information Systems, Inc.*, 1996 WL 480370, *5 (N.D. Ill. 1996) (holding that employer's walking through a room full of black employees and saying, "you people need to be in a zoo," failed to show racial harassment, because the statement was not sufficiently connected with race).   Even assuming the utterance was intended to be racially derogatory, the court finds that these incidents fall short of being sufficiently severe or pervasive as to constitute an actionable hostile work environment claim.  *Cf. Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (sexually hostile work environment claim).

Plaintiff obviously found the harassment that she complains of to be subjectively severe. Even so, the court also must evaluate the objective severity of the conduct utilizing the following, non-exhaustive factors: (1) frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether

---

[175]Plaintiff's brief opposing summary judgment, at 27.

the conduct unreasonably interferes with the employee's job performance. *See, e.g., Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citations omitted). The court encounters difficulty in accurately assessing the frequency of the conduct complained of, given the vagueness of plaintiff's allegations. However, the court need not languish over that determination, because the court finds that plaintiff cannot satisfy any of the remaining sub-elements. Plaintiff's entire argument in support of her "Terms and Conditions of Employment" claim consists of about one page of text, most of which is devoted to cataloging the events that plaintiff complains of.[176] Plaintiff does not make any detectable effort to rebut those portions of defendant's brief arguing that these events are not severe.[177] *Cf. Blue Cross & Blue Shield v. Weitz,* 913 F.2d 1544, 1550 (11th Cir. 1990) (holding that there is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment). It is the plaintiff's responsibility to set forth her prima facie case, and she has not done so here. *See LeBlanc v. TJX Companies, Inc.*, 214 F. Supp. 2d 1319, 1332 (S.D. Fla. 2002) (holding that "[t]he Court finds Plaintiff's claims lacking in allegations of severity as well. Plaintiff simply states that it was severe . . . . No further detail is provided as to this factor. . . . Plaintiff's allegation alone does not prove his claim."). Similarly, plaintiff does not address how the complained-of conduct can be reasonably construed to be physically threatening or humiliating. Plaintiff also does not address whether the conduct of which she complains unreasonably interfered with her job performance.

In order to survive summary judgment, it is not sufficient that plaintiff provide the court with a collection of ambiguous facts; rather, she must demonstrate that those facts are sufficient to set forth a prima facie case in order to survive summary judgment. Plaintiff has not addressed, much

---

[176]Plaintiff's brief opposing summary judgment, at 26-27.

[177]Defedant's brief in support of summary judgment, at 30-37.

less proven, several prongs of her hostile work environment claim and, thus, that claim is due to be dismissed.

**C.      Retaliation**

Plaintiff's complaint briefly states that "[t]he retaliation against the plaintiff occurred after she had made complaints against the defendant for race discrimination."[178]

Plaintiff claims that there is direct evidence of defendant's retaliatory intent, stating in her brief: "Plaintiff realleges the same arguments made earlier on the issues of mendacity and direct evidence and inconsistent statements."[179]  Plaintiff asserts that the following incidents constitute direct evidence of defendant's retaliatory intent:

(1)      Peeples referred to plaintiff as "you people" on some unspecified occasion, and further told plaintiff that "you people don't want to work."

(2)      Williams stated that "black people are late all the time," and plaintiff attested that "Mr. Williams did refer to black people as not being as smart as white people." Plaintiff also claims that Peeples laughed in response to Williams's comments.

The court first notes that Peeples' references to plaintiff as "you people," under these circumstances, are *not* direct evidence of racially-discriminatory animus of any kind, because these statements do not overtly refer to plaintiff's race, as discussed in § II(B)(2), *supra*.  Regarding the allegation that Peeples laughed in response to comments made by plaintiff's co-worker, David Williams, neither Williams's statements nor Peeples's responsive laughter can reasonably be cast as direct evidence of retaliatory intent.   "To amount to direct evidence [of discrimination], a statement must:   (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus."  *Chambers v. Walt Disney*

---

[178]Complaint ¶ 6.

[179]Plaintiff's brief opposing summary judgment, at 26.

*World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001). Plaintiff has produced no evidence that Williams had any part in any decision regarding her employment, and his statements are not direct evidence of defendant's discriminatory intent. Further, Peeples's laughter is not direct evidence of defendant's discriminatory animus, because one can only *infer* as to why Peeples was laughing. *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (observing that the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"). Accordingly, the court holds that plaintiff has produced no direct evidence of retaliatory intent on the part of defendant. Therefore, her retaliation claim can be proven only via a circumstantial evidence analysis.

Although 42 U.S.C. § 1981 does not contain a prohibition against retaliation, the Eleventh Circuit has held that retaliation claims are cognizable under § 1981. *See Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1409-13 (11th Cir. 1998). Still, both Title VII and § 1981 require a plaintiff to demonstrate that she engaged in statutorily protected activity to establish a prima facie case of retaliation. *See Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis). To establish a prima facie case of retaliation, plaintiff must prove that: (1) she participated in an activity protected by § 1981; (2) that she suffered an adverse employment action; and (3) that there is a causal connection between elements (1) and (2). *See Hansen v. Perry Technologies*, 206 F. Supp. 2d 1223, 1237 (S.D. Fla. 2002) (citing *Gupta*, 212 F.3d at 587 (citing in turn *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999)). Once the plaintiff establishes a prima facie case, the burden shifts to

the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. If this burden is met, plaintiff must then demonstrate that defendant's proffered reason is pretext for retaliation. *See, e.g., Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287, 1307 (M.D. Ala. 1999). Here, the plaintiff's retaliation claim is due to be dismissed because plaintiff cannot set forth her prima facie case.

During her deposition, plaintiff stated that she complained to defendant's Ethics and Business Practices Department on February 7, 2000, alleging that Peeples had discriminated against her based upon her race.[180]

Plaintiff cannot demonstrate, however, that she suffered an adverse employment action. Plaintiff appears to be alleging that the following actions by defendant constituted adverse employment actions:

(1)     "Mr. Peeples should have given plaintiff the [fall outage] project at an earlier time to allow her as much time as possible to get ready for the outage."[181]

(2)     "Plaintiff was taken off the [fall outage] project by Mr. Peeples for medical reasons,

---

[180]Defendant's evidentiary submissions, Tab 1 (Smith deposition), at 52; Tab 7 (McCrary affidavit) ¶ 3. Plaintiff's brief, however, gives a different date, stating that "plaintiff reported [Peeples] in May of 2000 for discrimination." Unfortunately, plaintiff provides no citation to the record to indicate the source of this assertion. Thus, the court is left to determine, on its own, whether plaintiff is simply mistaken here, or whether plaintiff alleges the she complained twice, first in February, and again in May of 2000. Fortunately, plaintiff's deposition testimony provides the answer:

Q: And I had the date for when you presented the complaint to the ethics department around —

A: It was February of 2000.

Q: So we agree it was around February 2000 when you did that?

A: That's correct.

The court finds no evidence of a later complaint made by plaintiff. Accordingly, the court holds that plaintiff complained of discrimination on February 7, 2000; and that plaintiff's brief alleging a complaint in May of 2000 is not supported by the evidence, and thus will not be considered.

[181]Plaintiff's brief opposing summary judgment, at 25.

according to Mr. Peeples.  Plaintiff objected. . . ."[182]

"An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (ADA retaliation claim); *see also, e.g., Gupta*, 212 F.3d at 587 (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).  *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.")

"Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause'" of Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)).

In other words, a plaintiff "must show a serious and material change" in the terms, conditions, or privileges of the job before an employment action can be described as "adverse." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).  An employment action does not become "adverse" simply because an employee dislikes it, or disagrees with it. *See, e.g., Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee

---

[182]*Id.*

unhappy is an actionable adverse action."). That is because "Title VII[] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (citation omitted).

On the other hand, "conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII." *Bass*, 256 F.3d at 1118 (citing *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Robinson*, 120 F.3d at 1300).

The question of whether an employee has suffered an employment action that is sufficiently material to be actionable normally must be determined on a case-by-case basis, *see Bass*, 256 F.3d at 1118, *Gupta*, 212 F.3d at 587, using both a subjective and an objective standard. *See Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998) (recognizing that the subjective requirement is almost always satisfied, and imposing an objective requirement).

Plaintiff has produced no evidence to demonstrate that Peeples' act of assigning the fall outage project to her at a later date than she preferred somehow altered the terms, conditions, or privileges of her employment. Plaintiff merely states that "Mr. Peeples should have given me the project at an earlier time to allow me as much time as possible to get ready for the outage."[183] However, the evidence shows that this late assignment did not adversely affect plaintiff's performance on the project. In fact, plaintiff claims to have turned in all of the required work orders on time. Plaintiff's affidavit unequivocally states that "[d]uring the time that I was on this project, I filed all reports on time and finished all the tasks required."[184] Accordingly, the court holds that the timeliness of plaintiff's assignment to the fall outage project is not an adverse employment

---

[183]Plaintiff's evidentiary submissions, Number 1 (Smith affidavit), at 5.

[184]*Id.*.

action.

Plaintiff also claims that her removal from coordination of the fall outage project was an adverse employment action. Plaintiff was removed from the fall outage project and placed on two weeks leave on October 31, 2000. Plaintiff's leave was characterized by defendant as "Family Medical Act Leave (FMLA) Sick Leave, then FMLA Vacation until her paid leave was exhausted."[185] Plaintiff has produced no evidence that her paid leave was exhausted, or that the two weeks' leave had any tangible impact on her pay, conditions of employment, benefits, privileges, available vacation time, or job title. Plaintiff has not shown that she would have been promoted, but for her removal from the fall outage project. All that plaintiff has shown the court is that "[defendant] took [plaintiff] off the project when she wanted to stay on."[186] Plaintiff must show something more substantial to demonstrate that an event constitutes an adverse employment action. "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996). Accordingly, the court finds that plaintiff's removal from the fall outage project cannot be reasonably cast as an adverse employment action, and plaintiff's retaliation claim is due to be dismissed.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted as to all of plaintiff's claims. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

---

[185]Defendant's evidentiary submissions, Tab 4 (Banger affidavit) ¶ 8.
[186]Defendant's brief opposing summary judgment, at 27.

DONE this _____31st_____ day of October, 2002.

_____

United States District Judge